IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNA STAFFORD,<br><br>  Plaintiff,<br><br> v.<br><br>SOCIAL SECURITY ADMIN.,<br><br>  Defendant.<br>_____/ | No. C-05-1113 EDL<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

### I. INTRODUCTION

During the course of a child abuse investigation, a Social Security Administration ("SSA") employee disclosed confidential medical information regarding Donna Stafford to a Marin County Child Protective Services ("CPS") employee without Stafford's authorization. Stafford sued the SSA under the Privacy Act. See 5 U.S.C. § 552a(g)(1)(D) (2006). The parties then filed cross motions for summary judgment. For the reasons set forth below, the Court grants in part and denies in part Plaintiff's motion for summary judgment, and denies Defendant's motion for summary judgment.

### II. FACTUAL BACKGROUND

Throughout the 1990s, Marin County CPS investigated a number of allegations that Plaintiff was abusing her daughter, G.S. See Declaration of Jonathan U. Lee ("Lee Decl."), Ex. D at No. 9. One of these referrals resulted in G.S. being removed from Plaintiff's home and placed in foster care. See id. at No. 13. On February 24, 2003, G.S. met with Lisa Ahrens, a guidance counselor at her school. Id., Ex. L at 118. G.S. showed Ahrens the scars G.S. had made by cutting herself. Id. at 119. G.S. also told Ahrens that she felt that Plaintiff had been abusive towards her her entire life,

and that G.S. was scared about what Plaintiff might do to her if she discovered that G.S. had spoken about the abuse. Id. Ahrens made a report to CPS that afternoon. Id.

In response to Ahrens' report, CPS assigned Kim Contreras as an emergency response investigator. See generally, id., Ex. B at 16:14-18:13, 21:2-6, 51:2-6. Contreras met with G.S. and Ahrens on February 26, 2003 and learned about G.S.'s tumultuous life with Plaintiff. Id., Ex. J at 5-7. Contreras, Ahrens and G.S. agreed that Contreras would wait several weeks before approaching Plaintiff, giving G.S. time to prepare herself for the visit and her mother's potential reaction. Id., Ex. L at 119. On February 28, 2003, Ahrens spoke with Plaintiff and recommended that G.S. obtain counseling. Id. at 120. Ahrens never informed Plaintiff that G.S. had been cutting herself, but only that G.S. was having academic problems. See Declaration of Donna Stafford ("Plaintiff Decl.") ¶¶ 39, 57-58. Plaintiff refused to allow G.S. to see the counselor. Lee Decl., Ex. L at 120. Ahrens reported Plaintiff's refusal to get G.S. into therapy to Contreras. Id., Ex. B at 17:15-21 ("I believe what happened was we got a call from [Ahrens], who said that the mother was not on board to address the issues of this child's self-mutilating and reasons why she may be self-mutilating").

On March 19, 2003, Contreras met Plaintiff at the family home and told her that G.S. had been self-mutilating. See id., Ex. A at 138:20-23. Contreras found Plaintiff

> really uncooperative and not willing to address her child's needs. The fact that there was denial on the mother's part to not want to accept that her child may be self-mutilating was – was mine and the mental health therapist's biggest issue. I remember that. I remember that that was the – you know, in my view as a social worker, raised the risk of a child because of the mother's denial. . . . I just remember that it was very confrontational, very defensive, and kind of scary for me as a working because I hadn't seen this heightened sense of denial in the three years I'd been there.

Id., Ex. B at 27:16-32:11, see also id. at 38:1-10. Because of Plaintiff's behavior during the home visit, Contreras decided to detain G.S. in order to keep her safe. Id. at 31:21-32:4, 54:14-18. Contreras testified that she made the decision to detain before speaking with anyone at the SSA. Id. at 53:11-53:25. After Contreras' visit, Plaintiff called Ahrens and was distressed that Ahrens had made a report to CPS. Lee Decl., Ex. L at 120. Ahrens invited Plaintiff to the school. Plaintiff appeared so angry and abusive to G.S. during that meeting that Ahrens did not feel comfortable sending G.S. home after school. Id. at 121. Ahrens called CPS and eventually Plaintiff agreed to allow G.S. to spend the night away from home. Id.

2

1    Because Contreras felt that Plaintiff's behavior during the home visit had been irrational, and
2 because of G.S.'s allegations that Plaintiff was reluctant to spend food stamps and instead searched
3 through dumpsters to find food, Contreras wanted to learn more about the family's financial
4 situation so that she could provide additional resources such as getting Plaintiff on CalWorks, or
5 provide counseling services. See Lee Decl., Ex. B at 46:3-25, 49:3-9, 67:9-68:9, 196:10-16.
6 Through a call to Marin County Adult Protective Services, Contreras learned that Plaintiff was
7 receiving aid from the SSA, and the amount of aid she received. Id. at 47:1-10. Contreras then
8 called the SSA to determine why Plaintiff was receiving benefits, because knowing whether Plaintiff
9 had a physical or mental disability "would help [Contreras] determine how best [CPS] could serve
10 the family." Id. at 183:11-19.

11    When Contreras called the SSA on March 19, 2003, she spoke with Sheila Saunders.
12 Saunders recalls Contreras "saying it had to do with custody, a custody, or – I don't know if it was a
13 child or children, and that our client was the parent." Id., Ex. C at 68:25-69:3. Contreras testified
14 that she probably told Saunders that she was investigating reports of child abuse. Id., Ex. B at
15 57:21-58:12. Saunders gave Contreras the precise diagnosis of mental illness on which the SSA had
16 made its determination that Plaintiff was disabled and thus eligible for benefits. See id. at 59:7-24,
17 61:21-24; see also Plaintiff's Exhibit ("Pl.'s Ex.") 1 at 71:15-73:6. Saunders did not have a signed
18 release for the information before disclosing it to Contreras. Plaintiff Decl. ¶ 68. Saunders never
19 asked Contreras whether she had a signed release form from Plaintiff. Pl.'s Ex. 1 at 87:18-23.
20 Saunders understood that it was improper to disclose medical records to anyone outside the agency
21 without authorization. Id. at 43:5-8, 69:21-25. However, starting in 1990, Saunders had occasionally
22 released information to Marin County officials without the proper authorization because, in her
23 experience, the agency already had the release somewhere or she eventually received signed
24 authorizations. See Lee Decl., Ex. C at 69:11-14, 77:15-18, 79:17-80:6, 81:9-24, 84:3-10 (Marin
25 County "always produced the signed releases, always, invariably"); see also Pl.'s Ex. 1 at 93:21-
26 95:1. Although she had never before received a call from CPS, Saunders did not make a distinction
27 between CPS and other Marin County agencies. See Lee Decl., Ex. C at 68:1-21, 88:11-18.
28    CPS filed a juvenile dependency petition in Marin County Superior Court in March 2003,

3

alleging that G.S. was at risk of severe physical and emotional harm and neglect as a result of Plaintiff's actions. Lee Decl., Ex. I. The petition referenced the SSA diagnosis specifically. Id. at 5. Upon being served with the petition on March 21, 2003, Plaintiff learned for the first time that she had been diagnosed by the SSA as being mentally ill (whereas Plaintiff had applied for benefits based on various perceived physical ailments). Plaintiff Decl. ¶ 6. On the day of the detention hearing, Plaintiff commented in front of G.S. and a CPS worker that Plaintiff might as well drive her car off the Golden Gate Bridge. Lee Decl., Ex. A at 191:17-192:8. CPS reported the statement to law enforcement officers who temporarily restrained Plaintiff under California Health & Safety Code section 5150. Id. at 81:17-86:9.

When the parties agreed on May 16, 2003 to negotiate an agreement to resolve the matter, the petition was dismissed. Id. at 40:12-41:8. Under the terms of the agreement, G.S. went to live with family friends. Id. at 65:1-67:12. G.S. has since reached the age of majority.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, the moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. Id. at 325. The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 ( 1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Evidence that "is

merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. Id. at 249-250.

Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Fed. R. Civ. P. 56(c). A "material" fact is one which might affect the outcome of the case under the applicable law. Anderson, 477 U.S. at 248. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. Id. In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. Id. at 255. Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." Id.; see also Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999) (citing Lowe v. City of Monrovia, 775 F.2d 998, 1008 (9th Cir. 1986)).

### B. The Privacy Act

The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b). The Privacy Act nonetheless allows agencies to disclose private information without prior consent in a number of circumstances, including exceptions numbered 3, 7 and 8:

> . . . . (3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section; . . . . (7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement agency for which the record is sought; (8) to a person pursuant to a showing of compelling circumstances affecting the health and safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual.

5 U.S.C. § 552a(b)(3), (7), (8).

### C. Elements of a Privacy Act Claim

To establish a claim for wrongful disclosure under the Privacy Act, Plaintiff must establish

5

that (1) her diagnosis information is a record contained in a system of records; (2) the SSA disclosed the information improperly; (3) the disclosure had an adverse effect on Plaintiff; (4) the disclosure was willful or intentional; and (5) Plaintiff suffered actual damages. See Doe v. Chao, 540 U.S. 614, 622-23 (2004); Quinn v. Stone, 978 F.2d 126, 131 (3d Cir. 1992). There is no dispute that Plaintiff's medical diagnosis information is a record contained in a system of records, or that Saunders disclosed the diagnosis to Contreras without authorization to do so.

The disputed elements are: (1) whether the disclosure falls into one of the exceptions under the Privacy Act allowing disclosure; (2) whether Saunders disclosed the information willfully or intentionally; (3) whether Plaintiff suffered any adverse effects as a result of the disclosure; and (4) whether Plaintiff suffered any actual damages as a result of the disclosure.

### 1. None of the Privacy Act Exceptions Applies In This Case.

Defendant argues that the disclosure was permitted under each of the three of the exceptions noted above: the routine use exception, the law enforcement exception, and the health or safety exception. Defendant also argues that California public policy should shield the SSA from liability for cooperating in a child abuse investigation. The Court concludes that the disclosure does not come within the ambit of any of these exceptions.

#### a. Routine Use

The Act defines "routine use" as "the use of [a] record for a purpose which is compatible with the purpose for which it was collected[.]" 5 U.S.C. § 552a(a)(7). Pursuant to 5 U.S.C. section 552a(e)(4)(D), the SSA published in the Federal Register a list of thirty-three "routine uses" of the records in its system. See 60 Fed. Reg. 2144 (1995). The SSA contends that two routine uses apply here: Routine Use No. 14 (disclosures from SSI record may be made for routine uses to "State agencies to enable them to locate potentially eligible individuals and to make eligibility determinations for extensions of social services under the provisions of title XX of the [Social Security] Act" and Routine Use No. 19 (disclosures may also be made to "Federal, State or local agencies (or agents on their behalf) for administering cash or noncash income maintenance or health maintenance programs (including programs under the [Social Security] Act). Such disclosures include, but are not limited to . . . (d) State agencies to locate potentially eligible individuals and to

6

1  make determinations of eligibility for the food stamp program"). Id. Plaintiff argues that this
2  exception does not apply because the SSA failed to give actual notice of these two routine uses, and
3  because the disclosure was not compatible with the purpose for which the information was collected.

          (i)      Adequacy of Notice

5  Relying on Covert v. Harrington, 876 F.2d 751 (9th Cir. 1989), Plaintiff argues that
6  Defendant failed to give adequate notice of the routine uses which might apply to Plaintiff's
7  information. In Covert, a Department of Energy ("DOE") employee filled out a Personnel Security
8  Questionnaire ("PSQ") and supplemental forms that advised him that his personal information "will
9  be used to determine eligibility for a DOE personnel security clearance or access authorization" and
10 that "[a]ccess to or use of the information provided is permitted *only* to the authorized Federal
11 Government investigative agencies conducting the investigations and to DOE personnel directly
12 involved in the processing of the determination of the eligibility of the individual for security
13 clearance or access authorization." Id. at 752 (emphasis in original). Instead, the DOE also used the
14 information in a criminal investigation of its employees. The Ninth Circuit held that the DOE had
15 violated the Privacy Act:

> It is beyond dispute that the government did not comply with [section 552a(e)(3)(C) of the Privacy Act] in this case. The government did not indicate to plaintiffs that the PSQ information would be used for law enforcement purposes; indeed the government explicitly stated that the information would *only* be used for security clearance purposes. . . . Under the plain terms of the statute, a collecting agency is under a duty to inform the individuals from whom it is collecting information of the routine uses to which that information may be put. *The statute gives the agency no discretion not to discharge this duty*.

21 Id. at 755-56 (emphasis added).
22 Here, by contrast, Defendant gave Plaintiff notice of potential future uses on three occasions
23 when collecting her information. See Lee Decl. Ex. U; Ex. V; Ex. W. Defendant did not foreclose
24 other uses besides determining Plaintiff's eligibility for benefits. Rather, the notices advised her:
25 "Although this information you furnish on this form is almost never used for any purpose other than
26 making a determination on your disability claim, such information may be disclosed by the [SSA] as
27 follows . . . These and other reasons why information about you may be used or given out are
28 explained in the Federal Register. If you would like more information about this, any Social

7

Security office can assist you." Id. Since 1981, the Federal Register has included Routine Uses No. 14 and No. 19. See Declaration of Willie Polk ¶ 4. Thus, the SSA expressly left open the possibility that the information would be put to other uses and encouraged Plaintiff to find out what those other uses might be, specifically directing her to the Federal Register where these other Routine Uses were listed.

Plaintiff's argument that Routine Use No. 14 is so broad that it defeats Covert's actual notice requirement is unconvincing. No court has found that Routine Use No. 14 is improper or over-broad. Moreover, by Plaintiff's logic, the SSA would be required to anticipate and list every single potential permutation of a routine use in order to invoke this exception to the Privacy Act. The Court is not persuaded that Congress intended to place such an impractical burden on federal agencies, which would in effect severely curtail the very exception that Congress sought to carve out in the interest of practicality.

(ii)   Compatibility of Use

Although this is a close question, the Court concludes that the SSA disclosure was not for a compatible use. See Swenson v. United States Postal Serv., 890 F.2d 1075, 1078 (9th Cir. 1989) (citing Britt v. Naval Investigative Serv., 886 F.2d 544 (3d Cir. 1989)). First, the SSA itself narrowly defines the compatible use requirement as the use of information to determine the *same* matter in programs with the *same* purposes:

> It is also our policy to disclose information for use in other programs which have the same purposes as SSA programs if the information concerns eligibility, benefit amounts, or other matters of benefit status in a social security program and is relevant to determining the same matters in the other program. For example, we disclose information . . . to State general assistance programs, and to other income maintenance programs at all levels of government. . . .

20 C.F.R. § 401.150 (2006). Thus, the SSA generally would consider a use to be compatible if it relates to determining eligibility for needs-based income maintenance (for example, AFDC or CalWorks), or related medical benefits for low-income people (MediCal).

The SSA collected Plaintiff's medical information to determine whether she was disabled and therefore eligible for income maintenance. By contrast, CPS was not investigating whether Plaintiff qualified for a parallel state or local income maintenance program, but rather whether G.S.

8

should be removed from Plaintiff's home. Contreras already knew that Plaintiff was receiving Social Security benefits and the amount of those benefits, but testified that she wanted to know *why* Stafford received federal aid. Lee Decl., Ex. B at 182:7-183:19. Saunders testified that Contreras told her that the case involved a custody dispute. Contreras similarly testified that she told Saunders that she was investigating allegations of child abuse. There is no evidence that Contreras ever told Saunders that the purpose of her call was to determine Plaintiff's eligibility for any benefits, much less needs-based benefits. Moreover, while disclosure of the benefit status of an SSA recipient could have been a compatible use, disclosure of her precise mental health diagnosis went beyond mere disclosure of her benefit status as a matter of routine exchange of information between welfare agencies. Further, the disclosure was not to a state or local income assistance program, but to CPS, a program designed to protect children from abuse, and CPS then used the information in support of removing G.S. from Plaintiff's home.

Defendant points out that Routine Use No. 14 includes disclosure of information "[t]o State agencies to enable them to locate potentially eligible individuals and to make eligibility determinations for extensions of social services under the provisions of title XX of the Act." Through Title XX, the federal government provides block grants to state governments to furnish social services for a number of purposes, including preventing and remedying the neglect and abuse of children. See 42 U.S.C. § 1397(3) (2006). Because CPS was attempting to gather information to help prevent or remedy Plaintiff's abuse of her daughter, which is one of the goals of Title XX, Defendant argues that the disclosure fits within Routine Use No. 14. However, Contreras knew Plaintiff's location and knew that she was already receiving benefits from the SSA as well as the state. Moreover, even if Contreras had told Saunders that she needed the confidential information in order to determine whether Plaintiff was eligible for any benefits, she never indicated that these benefits would have been extended under Title XX. Further, the SSA's own interpretation of this Routine Use contemplates disclosure of more routine information useful to locate individuals and assess their income levels, rather than medical diagnoses: "Relevant non-tax return information (including verification of SSNs) may be disclosed to locate individuals potentially eligible or determine eligibility for: protective services to prevent abuse, neglect and exploitation of

9

children...." Lee Decl., Ex. H (SSA POMS § 03314.120). Finally, Plaintiff provided information to the SSA in order to apply for disability benefits under Title II, not to obtain benefits under Title XX. See Compl. ¶¶ 5-7.[1] Thus, while preventing child abuse is a goal of Title XX of the Social Security Act, this worthy goal is not shared by Title II. See 42 U.S.C. §§ 401 *et seq.*, 1397. Thus, the Court concludes that disclosing Plaintiff's precise medical diagnosis to CPS in the absence of any indication that the information would be used to determine eligibility for an income-maintenance program or related medical benefits was not compatible with the purpose for which the information was collected.

### b. Health & Safety

Defendant also contends that the danger to Plaintiff's daughter triggered another exception to the Privacy Act permitting disclosure in "compelling circumstances affecting the health or safety of an individual if upon such disclosure notification is transmitted to the last known address of such individual." 5 U.S.C. § 552a(b)(8); see also 20 C.F.R. § 401.160 (2006) ("When we make these disclosures, the Privacy Act requires us to send a notice of the disclosure to the last known address of the person whose record was disclosed"). The SSA cannot satisfy this exception, however, because it did not provide the requisite notice of the disclosure to Plaintiff after making the disclosure.

### c. Law Enforcement

The SSA's alternative attempt to invoke the law enforcement exception also fails because the head of CPS did not provide the request in writing to the SSA. See 5 U.S.C. § 552a(b)(7); see Doe v. Naval Air Station, 768 F.2d 1229, 1233 (11th Cir. 1985) ("exemption (b)(7) requires a *written* request for disclosure by the head of the agency making such request to the agency which maintains the record" (emphasis in original)).

---

[1] Defendant contends that Plaintiff has since conceded that she was a Title XVI recipient rather than a Title II recipient. See Def.'s Opp'n at 5 n.2. Title II provides for Social Security Disability Insurance benefits, while Title XVI provides Supplemental Security Income benefits. Plaintiff does not contest the issue. See 42 U.S.C. §§ 401, 1381 (2006). Either way, whether Plaintiff received funds under Title II or Title XVI – as opposed to Title XX – is immaterial to this analysis. Both Title II and Title XVI serve the same purpose: provision of income support to disabled individuals. Neither is aimed at the prevention of child abuse or neglect.

10

        d. Exception based on California Public Policy

Defendant also urges the Court to recognize a new exception to the Privacy Act based on California public policy to protect persons investigating acts of child abuse: "The public interest in detecting and eradicating child abuse is so strong that under California state law, malicious acts or acts taken without probable cause by investigators such as CPS employee Contreras are immunized." See Def.'s Opp'n at 17-20. While prevention of child abuse is undoubtedly an important public policy, Congress enacted the Privacy Act as a limitation on the sharing of private information among government agencies to further what it determined was an important public policy. The Court cannot create an exception to a federal statute based on state policy.

**2. There is a Triable Issue of Fact Whether the Disclosure Was Willful or Intentional.**

To establish a violation under the Privacy Act, Plaintiff must overcome a high hurdle by establishing that Saunders' conduct in disclosing Plaintiff's confidential information amounted to more than gross negligence. See Johnston v. Horne, 875 F.2d 1415, 1422 (9th Cir. 1989) ("the term 'willful or intentional' requires conduct amounting to more than gross negligence"); Wilborn v. Dep't of Health and Human Servs., 49 F.3d 597, 602 (9th Cir. 1995) (requires either committing an act "'without grounds for believing it to be lawful, or by flagrantly disregarding others' rights under the Act'" (quoting Covert, 876 F.2d at 757 (quoting Albright v. United States, 732 F.2d 181, 189 (D.C. Cir. 1984))).

While some facts might support a finding of willfulness, others indicate only negligence. On the one hand, Saunders testified that in her early years at the SSA, she scrupulously observed the release requirements despite the delay entailed. Later, however, she sometimes provided information to Marin County employees without a release in hand because she knew that the releases "invariably" would be produced. Moreover, at the time Saunders disclosed Plaintiff's information to Contreras, she understood that it was improper to disclose medical records to anyone outside the SSA without authorization and that doing so probably amounted to a violation of the Privacy Act. Saunders also disclosed the information even though she only knew that the matter concerned "child custody," rather than one of the acceptable bases for disclosure.

On the other hand, Saunders thought that Plaintiff had no choice but to give her consent and

11

1  expected, based on her uniform prior experience of dealing with Marin County agencies, that a
2  release had been provided or would shortly be provided.  Although this was the first time she dealt
3  with CPS, as opposed to other Marin County welfare agencies, confusing CPS with the latter
4  agencies in itself was merely negligent.  Further, Saunders' disclosure falls short of the egregious
5  conduct that courts have found to be actionable under the Privacy Act.  For example, in Wilborn, the
6  plaintiff was a former Health and Human Services ("HHS") staff attorney who left HHS to engage in
7  private practice after receiving a disciplinary action, which he successfully appealed.  The
8  disciplinary action was rescinded and ordered expunged from his files.  Once in private practice, the
9  plaintiff argued a case before the ALJ who had originally issued the disciplinary action and who had
10 been ordered to remove the document from the plaintiff's file.  Yet in his written decision, the ALJ
11 expressly referred to the disciplinary action, as if it had not been expunged.  In concluding that the
12 disclosure was willful, the Ninth Circuit stressed that the ALJ was the highest ranking officer in his
13 office, that he was personally familiar with the Privacy Act, that he had instructed incoming staff
14 that the Privacy Act prevented them from disclosing information without authorization, and that an
15 HHS attorney had advised the ALJ that he should not include language regarding the disciplinary
16 action in his opinion.  By contrast, Saunders was not the highest ranking officer in the SSA and had
17 not been specifically advised not to disclose Plaintiff's diagnosis, although she was familiar with the
18 Privacy Act and knew that it required obtaining a consent form.  And unlike the ALJ, Saunders did
19 not disclose the information out of vindictiveness, but rather to facilitate a process that she believed
20 with some justification would inevitably take place.  In view of the closeness of this question and its
21 fact-intensive nature, at this point the Court declines to grant summary adjudication of this issue.

### 3. There is a triable issue of fact whether Plaintiff experienced an adverse effect or actual damages because of the disclosure.

24  Plaintiff sets forth the same evidence to satisfy the adverse effect and actual damages
25 elements of her Privacy Act claim.  Plaintiff learned of the disclosure on March 21, 2003.  Within
26 weeks of that date, Plaintiff paid Dr. Fairfield, a spiritual counselor, $10 for three visits.  See
27 Fairfield Decl. ¶¶ 2, 5-6.  Plaintiff also lists a number of expenses occurring months later, but which
28 Plaintiff contends were nonetheless caused by the disclosure: $10 to see a chiropractor in November

12

2003; $12 for an acupuncturist in November 2003, plus $8 for herbs; $52 to visit Dr. Zucker in October 2003; and $500 for yoga classes beginning in November 2003. See Lee Decl., Ex. E at No. 12; Pl.'s MPA at 13; Pl.'s Reply at 3-4; Plaintiff Decl. ¶¶ 83-93. Plaintiff also contends that she suffered stress, anxiety, sleeplessness and embarrassment as a result of the disclosure. Pl.'s Opp'n at 20; Lee Decl., Ex. E at No. 10.[2]

If the disclosure actually caused Plaintiff to incur these fees, she has suffered sufficient "adverse effects" to open the courthouse door:

> "[A]dverse effect" acts as a term of art identifying a potential plaintiff who satisfies the injury-in-fact and causation requirements of Article III standing, and who may consequently bring a civil action without suffering dismissal for want of standing to sue. . . . That is, an individual subjected to an adverse effect has injury enough to open the courthouse door, but without more has no cause of action for damages under the Privacy Act.

Chao, 540 U.S. at 624-25 ((citations omitted)); Quinn, 978 F.2d at 131 (separating adverse effect into two components: a standing requirement and a causal nexus between the disclosure and the adverse effect). The same medical fees also would satisfy the actual damages element of Plaintiff's Privacy Act claim if Plaintiff established that she incurred them as a result of the disclosure.

The issue of causation, however, presents a triable issue of fact. First, Plaintiff had other significant stressors in her life that could have caused her to seek out Dr. Fairfield. See Orekoya v. Mooney, 330 F.3d 1, 10 (1st Cir. 2003) ("Even if Orekoya could have proven emotional distress, there was nothing but speculation to link it to a *Privacy Act* violation. Orekoya had independent reasons to be distressed: he had been accused of rape, which led to [his employer] suspending him from his job; and a massive layoff at [his workplace] caused him to lose that job" (emphasis in original)); Albright, 732 F.2d at 190 ("Although the plaintiffs presented much evidence of emotional trauma and shock suffered by the analysts, there was little indication that these emotional injuries were caused by the relatively innocuous and obvious videotaping, rather than by the Bureau's decision drastically to restrict the analysts' prospects for promotions and pay increases").

---

[2] Defendant also argues that Plaintiff has introduced no evidence that the disclosure had an adverse effect either on her relationship with her daughter or on the removal proceedings. See Def.'s MPA at 20-22. The Court agrees. Plaintiff, however, does not rely on either of these effects to establish this element of her claim and has introduced other evidence to establish that she suffered an adverse effect from the disclosure.

13

1    Second, the timing of many of the costs that Plaintiff incurred also suggests that the
2 treatments were not causally related to disclosure.  For example, Plaintiff began taking yoga therapy
3 in November 2003 – more than seven months after she learned about the disclosure.
4    Third, some of the problems that Plaintiff now contends were caused by the disclosure
5 actually pre-dated the disclosure.  <u>See</u>, <u>e.g.</u>, Lee Decl., Ex. A at 172:4-173:25 ("I had the
6 fibromyalgia, and the pain and stuff, my knee, my back, the usual things that I've had over a period
7 of time related to my fibromyalgia"); Ex. E at No. 9 (elbow pain since 1997, right knee pain since
8 1999, recurring in 2003); Ex. T at 97, 98 (disabling environmental allergies, chronic fatigue
9 syndrome, arthritis, gastrointestinal problems, Ghilbert's Disease and back pain since 1982); <u>cf. id.</u>,
10 Ex. E at No. 10 (disclosure caused "emotional distress, including stress, extreme shame, anxiety
11 sleeplessness, and situational depression. . . .  the lack of sleep and stress affected me physically,
12 contributing [a pre-existing] knee and hip injury . . . that recurred in July 2003, and has now become
13 permanent.  The stress also weakened my immune system, contributing to numerous severe skin
14 infections subsequent to the incident").  There is evidence that both Drs. Fairfield and Zucker
15 believed that they were treating Plaintiff for pre-existing conditions rather than any recent problems
16 caused by the disclosure.  <u>Id.</u>, Ex. Z ("classic and previously undiagnosed symptoms of post-
17 traumatic head injuries, which are at least a partial cause of her overall constellation of difficulties. I
18 believe that this also contributes to her debilitating sleep patterns.  She also suffers from Crohn's
19 Disease and Celiac Disease. . . ."); Pl.'s Ex. 11 (fibromyalgia, "deep-seated fears and anxieties that
20 probably stem from past abuse," and hypoglycemia); <u>see also</u> Fairfield Decl. ¶¶ 2-3 ("I treated
21 Donna Stafford for anxiety, situational depression and a very low stimulus threshold.  She also
22 complained of having debilitating sleep patterns").  Neither Dr. Zucker nor Dr. Fairfield mentions
23 the disclosure.  Indeed, rather than attributing any of Plaintiff's problems to the disclosure, Dr.
24 Zucker notes that "[i]n talking to the mother, it is clear that she has been greatly upset by the loss of
25 her daughter and confused by the matter."  <u>See</u> Pl.'s Ex. 11 at 2.
26    Despite Plaintiff's long-term medical problems, despite discovering that her daughter was
27 cutting herself and attributing that behavior to living with Plaintiff, despite having G.S. removed
28 from her custody and her home, and despite being subject to an emergency psychiatric hold after

*United States District Court*
For the Northern District of California

14

making suicidal statements in front of a CPS worker, Plaintiff testified that the disclosure was the cause of her distress and the cause of her seeking therapy and incurring these costs. Lee Decl., Ex. A at 175:5-177:4. While Plaintiff's own statements are sufficient to raise a triable issue whether the damages were causally connected to the disclosure, and therefore to defeat Defendant's motion for summary judgment on both the adverse effect and the actual damages elements, they are not sufficient to establish causation.

Finally, the Court notes the Circuit split on whether a plaintiff may recover damages for emotional distress under the Privacy Act, which the Ninth Circuit has not yet addressed. Compare Johnson v. Dep't of Treasury, 700 F.2d 971 (5th Cir. 1983) (compensation allowed for proven mental injuries), with Fitzpatrick v. IRS, 665 F.2d 327, 331 (11th Cir. 1982) (no compensation for "generalized mental injuries, loss of reputation, embarrassment or other non-quantifiable injuries"); see also Hudson v. Reno, 130 F.3d 1193, 1207 (6th Cir. 1997); Orekoya, 330 F.3d at 7-10. The Supreme Court explicitly left the question unresolved in Chao. 540 U.S. at 627 n.12. Because there is a triable issue of fact on causation, the Court need not address the issue unless and until Plaintiff establishes that her damages were caused by the disclosure at trial.

## V. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Plaintiff's motion for summary judgment; and denies Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: June 28, 2006

ELIZABETH D. LAPORTE
United States Magistrate Judge

15